Let me please the court. My name is Omar Ortega, and I represent the appellant Lapeirre-Gutt in this action. Your honors, my client has two essential arguments, one being that the claimant's main impairment, that of fibromyalgia, was improperly evaluated by the administrative law judge. The other is that the judge, in this case, did not adequately assess the claimant's credibility. The first argument, that the claimant's fibromyalgia impairment was not properly evaluated, is evident in that the administrative law judge spends much of his discussion on why this impairment, which he did find to be severe, however not disabling, was not disabling because of lack of objective evidence. Objective medical evidence. Correct. Objective medical evidence. The administrative law judge notes the lack of any finding of nerve root impingement, foraminal narrowing, spinal cord impingement, nerve root irritation, etc. However, none of these findings are required in order to be found disabled or even to make the medically determinable impairment of fibromyalgia. In fact, it's quite the opposite. The lack of presence of all of these findings leads the medical personnel to make the proper diagnosis of fibromyalgia. The one objective finding that would be required in order to diagnose fibromyalgia is that of the tender point examination, which in fact was noted. The administrative law judge relies on an evaluation by a DDS physician who did not examine the claimant but merely examined the records and submitted a report. However, such a report was based on conditions that did not include a fibromyalgia. This report, which was signed in May of 2005, was actually submitted prior to the diagnosis of fibromyalgia by the claimant's treating physicians. The evidence will reveal that the claimant did suffer from a cervical impairment while she was employed. She had subsequent surgery and even returned to work while recovering from this cervical condition. We submit that the DDS analysis was simply an analysis of the limitations imposed by the claimant's cervical condition. However, the claimant is alleging disability based on a variety of factors. The administrative law judge finds that the claimant is able to perform substantial gainful activity and is not so limited as alleged by her treating, her three treating doctors, at least two of which are board certified, based on improper evidence. The administrative law judge further makes distinctions in the records which seems to be mischaracterizing the evidence. For example, the administrative law judge rejects the opinion of the treating neurologist because the treating neurologist, Dr. Kapoor, had indicated in an impairment questionnaire that the claimant's headaches were severe. Later on, the claimant indicates that it's not so bad. However, the evidence reveals that there's an eight-month period between the two evaluations. Dr. Kapoor does not deny that the claimant's headaches improved. Rather, what Dr. Kapoor is suggesting is in July of 2005, and that should be found in transcript page 661, that the claimant's headaches were indeed at that time significantly impairing her ability to function. Furthermore, the administrative law judge improperly finds that the lack of muscle wasting or atrophy is indicative of the claimant's lack of severity of her medical condition as in regards to the fibromyalgia. Dr. Kapoor responded to that in a report, and that can be found in transcript page 785, in which he notes that no such finding is required or even easily obtainable in claimants in conditions such as fibromyalgia. On that, I think I agree with you. I have seen several of these fibromyalgia patients. I've never seen any requirement about showing, you know, muscle wasting as a requirement for a fibromyalgia diagnosis, right? That's correct. And I think that it's a poor assumption. First of all, it's extremely difficult to even ascertain muscle wasting, or as the judge refers to as atrophy. Atrophy implies that in order to properly assess atrophy, first of all, you need precise measurements. And that can be done in two ways, either previously having these measurements and comparing them later, or measuring one lower extremity at a certain location and comparing it to another. There's no evidence that someone who suffers from fibromyalgia, the main symptoms of which is significant pain and fatigue, would suffer from such things as muscle wasting. In fact, the evidence will show a more accurate way of determining this, and the judge uses this to imply that the claimant is not as inactive as she alleges. The more accurate determination can be ascertained by judging from the weight. One who is inactive is likely to gain weight. And in this case, in fact, she does gain significant amounts of weight. Furthermore, I'd also like to touch on Dr. Bennett's opinion. The judge, the administrative law judge in this case, finds that the doctor is inconsistent in his assessments in terms of the residual functional capacity. On page 777 of the transcript and 765, I submit to you that both these residual functional assessments are quite identical. The only difference is that in one case, the doctor is assessing how much the claimant can do within an eight-hour period, and in another, the doctor is assessing how much she can do at one time. There is no inconsistency at all, and the doctor, in fact, makes that clear. However, nonetheless, the administrative law judge makes the jump to suggest that these two assessments are inconsistent. The administrative law judge is also incorrect in finding that there's no compression fraction at L1. However, later in the administrative law judge's decision, he also misconstrues that and notes that there is a finding of it. There's evidence both by x-ray and MRI at page 445 and 446 of this compression fraction. In regards to the claimant's credibility assessment, the administrative law judge's credibility assessment, I submit that the judge makes suggestions that are insufficient to make a negative finding in credibility. For example, the judge notes that the claimant told her doctor that she walks for 20 minutes a day three times a day, or that she walks short distances both inside and outside her house, or that she does light housework. These sorts of statements are not inconsistent with the claimant's allegation of disabling pain, yet the administrative law judge uses these examples as reasonings for her inability for his finding that the claimant can perform substantial gainful activity. Did you handle this case in the district court? No, I did not. Okay. Were all? My firm did. I did not. Okay. And I would like to reserve my additional time for a rebuttal. That's fine. We'll hear from the government now, then. Good morning, Your Honors. Daniel Tallbrook for the Commissioner of Social Security. Substantial evidence supports the Commissioner's final decision to deny claimant's application for disability insurance benefits. As the district court noted, the ALJ provided legally sufficient reasons to reject the opinions of Dr. Bennett, Dr. Kapur, and Dr. Doneski. The ALJ also provided sufficient reasons to find the claimant was not credible. Just to begin with, I'd like to touch on the issue of atrophy. The ALJ claimed relied on the lack of any findings of atrophy to discredit claimant's statements that she had such extreme pain that she was required to lie down all day. The ALJ was not using lack of atrophy to show that she did not have fibromyalgia. In fact, the ALJ accepted that claimant had fibromyalgia and that she had limitations based on that fibromyalgia, just not to the extent that she claimed or that the treating sources claimed. The treating sources relied on a number of conditions that were controlled by medication and other treatments. First of all, Dr. Bennett said that claimant was limited because of her depression. But claimant informed examining psychologist Dr. General that she was taking Prozac and that it helped a lot with her depression. She told Dr. Kapoor the same thing. Similarly, Dr. Kapoor and Dr. Dineski relied on claimant's headaches as a basis for her limitations. But the record shows that when claimant was taking medication, her headaches were not a significant problem. Furthermore, she said at the hearing that medication brought the headaches under control. Dr. Bennett, Dr. Kapoor, and Dr. Dineski, all three, also stated that claimant had limitations based on spinal problems. But the objective evidence showed that examinations of her spine were normal or at most minimally abnormal. Finally, all three doctors stated that claimant had limitations based on fibromyalgia. Fibromyalgia is not determined by objective criteria, but rather based on a claimant's subjective reports of pain. So in this case, the ALJ found that claimant's ‑‑ for not having any objective medical findings, right? Yes, Your Honor. And that goes ‑‑ That's true, Your Honor. The lack of objective evidence undermines the treating sources' claims and statements about other impairments, impairments that could be objectively determinable. With regard to fibromyalgia, the analysis requires a consideration of whether a claimant's subjective statements about pain are credible because the doctors must look at what the claimant says to determine what limitations there would be. In this case, the ALJ did give just such sufficient reasons to find that claimant's statements were not credible. To begin with, the ALJ said that claimant gave inconsistent testimony. She said at the hearing that physical therapy did not improve her condition, but she had said on earlier occasions to doctors that physical therapy was helpful. Also, she stated at the hearing that she was in constant pain that required her to lie down all day, but the record shows that she experienced some relief from that pain at different periods by physical therapy, by medication, by injections, and by nerve blocks. Yeah, but the ALJ also criticized her for not continuing her physical therapy, although I thought she gave a very valid reason why they were discontinued. Don't you think her reasons were valid? The reason that she essentially didn't have a ride? She couldn't get there. I mean, her husband couldn't drive her. How could she continue physical therapy under those conditions? It seems to me an unfair criticism. Well, the ALJ's interpretation of the evidence with regard to that issue was that if someone had a condition that caused as much pain as hers did, she may have found some other way. But with regard to her physical therapy, the more significant point is that she made inconsistent statements about it. But you're calling me speculation, isn't it? I beg your pardon, Your Honor? To say, well, she could have found some other ways is just speculating. Yes, that was how the ALJ interpreted it. We can't depend on speculation, can we? Well, the ALJ provided other reasons. Another mode of transportation? Not with regard to whether she was able to get to the physical therapy, but other reasons about finding that she was not credible. And to the extent that there might have been any problem with that reason, that's not sufficient for finding that the credibility determination was not adequate. For instance, he seemed to think that she should have pursued some other kind of, some other form of treatment, some other than conservative treatment. But there's nothing in the record that shows that that kind of treatment is available for fibromyalgia, is there? With regard to fibromyalgia, no, Your Honor. So to me, that's not a very good reasoning. I mean, a lot of the ALJ's reasons were those kinds of reasons, weren't they? No, Your Honor. Most of the ALJ's reasons, the ALJ's main reason was inconsistency of statements, and to a large extent the way that effectiveness of treatment was related. An ALJ is permitted to consider the effectiveness of treatments in considering if claimants' statements about pain and other symptoms are credible. The ALJ also talked about inconsistencies between claimants' allegations to have to lie down all day and the fact that she was able to work for a friend at one point, that she walked on a regular basis, participated in physical therapy and aquatic therapy, and as you noted, Judge Tsushima, that the reason that she had stopped the therapy was because she didn't have a ride, not because of any inability to continue with it. Also, she stated that she was able to housework, and the record showed that she was able to travel. These activities, although not necessarily probative of whether she was able to do work, were inconsistent with her statements that she had to lie down all day, and that was how the ALJ used them to find that she was not credible. Finally, are you – I hope you're not making the argument here that this woman's attempt to tough it out and to do some work works against her, saying, you know, if she were a total malinger, she'd just lie down and do nothing? You're not making the argument by attempting to work and being unable to do it, that makes her not credible? No, Your Honor. The argument is not that her attempts make her not credible. It's the fact that she said at the hearing that her pain required her to lie down at all times, yet there is evidence in the record that she was able to do other things. So her activities were inconsistent with the statements that she was lying down at all times. Now, the ALJ, having properly rejected Klayman's subjective pain and symptom testimony, was able to use that as a basis to reject the treating source opinions opining limitations based on fibromyalgia, for the simple reason that those doctors had to rely on subjective complaints, subjective descriptions of pain, to find any limitations. Having rejected Dr. Bennett's, Dr. Kapoor's, and Dr. Doneski's, and finding that Klayman's statements were not credible, the ALJ gave great weight to the state agency physicians, who concluded that Klayman was capable of performing a limited range of light work. According to the vocational expert, that range of work permitted her to perform her past relevant work as a customer service representative and administrative assistant. On that basis, the ALJ determined. There were no jobs, right? There are no jobs for her. There were. Her past relevant work, she was capable of performing that work. That was what the vocational expert testified. Let's see. The ALJ makes the finding at page 22 of. Did the vocational expert find that there were really no jobs for someone with her limitations? No, Your Honor. The vocational expert found that Klayman was capable, with the limitations as the ALJ described them, Klayman would be capable of working at those, her past relevant work. But if you ask, you know, some of the limitations that were testified to, she wouldn't be capable of working, would she? The vocational expert testified that if Klayman's testimony had been credited, in other words, her testimony that she had to lie down all day, then no, there would be no work that she could do. But the ALJ provided a proper basis for rejecting those statements. And the quest of the issue then becomes whether the ALJ's actual residual functional capacity finding would have allowed her to perform her past relevant work. The vocational expert testified that, indeed, she could on that basis. Therefore, the ALJ determined that Klayman was not disabled. Thus, substantial evidence supported the Commissioner's final decision. The ALJ provided sufficient reasons for rejecting Klayman's credibility, as well as the opinions of Dr. Bennett, Dr. Kapoor, and Dr. Doneski. And on that basis, this Court should affirm the ALJ's final decision. All right. Are you suggesting that the record was correctly construed, or that there's something lacking in the record? Is there anything that could be developed and was not developed for this record? Or is everything in your judgment in the can, and the ALJ made the correct decision? The ALJ, the record was sufficient for the ALJ to make its determination about Klayman's residual functional capacity and her credibility. And the ALJ's decision was supported by substantial evidence in that record. Okay. Thank you, Your Honor. All right. Thank you, Mr. Talbot. Mr. Ortega. Your Honor, counsel makes the same mistake that the administrative law judge does, and that's essentially by misconstruing the evidence by picking a small part of the testimony of the evidence without considering the remainder. His suggestion that the Klayman travels. The two locations that she indicated she traveled to was to Surprise, Arizona, and to Flagstaff, Arizona. One is about 35 minutes from Mesa, which is where the Klayman lives. The other one is two hours and 15 minutes from Mesa. But, again, taken out of context. Additionally, the light housekeeping, the walking 20 minutes following prescribed treatment. Again, what did she testify to in regards to what she was doing? She was talking about working in 20-minute spurts and how painful it was after that, taken out of context. The fact that the nerve blocks worked. Yes, that's correct. She also indicated that it would work for about a day to three days. These are items that are consistently taken out of context by the administrative law judge, particularly things like pain. I feel better today. And then she goes on later in the testimony to talk about how she's feeling better in terms of her abdominal pain, but she's having pain someplace else. And I just want to point out a couple of citations that in terms of the nerve blocks working only three days, page 571 of the transcript, the pain is better now but was worse over the past week, 757. No denying that this Klayman's condition waxes and wanes in terms of its intensity. What we're really talking about is can this Klayman continue to work at this substantial gainful activity level for a consistent period of time? I'd also note that the administrative law judge seems in this case to be pretending that he's a doctor. He's not a doctor. He's making these findings about what should be in the case of this Klayman without regard to pointing to any medical evidence that would support that finding. In this case, it strikes me as a case where the judge should have called a medical expert or recontacted the physicians to ask them precisely the type of questions that the judge is assuming in the record. But I see that I am over my time. Any questions? Do you feel the record is sufficiently developed that it's a – that it would be no good sending it back for further development of the record? In effect, do we have everything that could be produced before an ALJ? Well, Your Honor, I think it's – to be honest with you, I thought looking back at this case, and I'm going to answer it sort of differently, looking back at this case, I would have loved for there to have been a medical expert there. However, also, if I were the attorney appearing before this judge, I would have assumed we have our I's dotted and our T's crossed. There's no question here. DDS did not even consider her fibromyalgia. We have not only a treating doctor, we have a board-certified neurologist. We have a board-certified rheumatologist. Yes, the rheumatologist said her headaches are bad and maybe, you know, he – that's not his specialty. His specialty is rheumatology. And the American Board of Rheumatology does recognize fibromyalgia as an impairment. And we believe that he is qualified to make those determinations. So you take out that administrative law judge's dictum that just, quite frankly, is not, in my opinion, medical evidence. The record is complete. All right. Thank you, Your Honor. Thank you, Mr. Ortega. We thank both counsel for their arguments. This case is submitted for decision.
judges: Stafford, Tashima, Thomas